ERIN DARLING
Law Office Of Erin Darling
3435 Wilshire Blvd., Ste 2910
Los Angeles, Ca. 90010
t. 323 736-2230
e. erin@erindarlinglaw.com

PAUL HOFFMAN, SBN 71244
MICHAEL SEPLOW SBN 150183
AIDAN MCGLAZE  SBN 277270
JOHN WASHINGTON SBN 315991
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
9415 Culver Blvd, #115
Culver City, CA 90230
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. jwashington@sshhlaw.com

CAROL A. SOBEL SBN 84483
KATHERINE L. ROBINSON SBN 323470
WESTON ROWLAND SBN  327599
Law Office of Carol A. Sobel
1158 26th Street, #552
Santa Monica, CA 90403
t. 310 393 3055
e. carolsobel@aol.com
e. klrobinsonlaw@gmail.com
e. rowland.weston@gmail.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, an organization, DAVID BROWN, DAVID CLENNON, and KERRY HOGAN, all individually and on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SANTA MONICA, a municipal entity, CHIEF CYNTHIA RENAUD, and Does 1-10 inclusive,<br><br>Defendants. | CASE NO.: **CLASS ACTION COMPLAINT**<br><br>**42 U.S.C. § 1983:  U.S. CONSTITUTION: FIRST, FOURTH, AND FOURTEENTH AMENDMENTS CALIFORNIA CONSTITUTION, ARTICLES 1, §§ 2, 3, 7, 13 CIVIL CODE § 52.1**<br><br>**FALSE ARREST, ASSAULT, BATTERY** |

1

## I.      INTRODUCTION

1.  "Debacle" is the word used by outside investigators, retained by Defendant City to review the events of last Spring, to describe Defendant City of Santa Monica's response to mass protests in the City, similar to those across the nation responding to the murder of George Floyd in Minneapolis by police officers. The events in Minneapolis produced enormous demonstrations around the country to condemn the deaths of Black and Brown men and women at the hands of law enforcement and vigilantes condoned by local law enforcement. Some of the larger protests in the region occurred in the City of Santa Monica.

2.  On May 31, 2020, a sweeping City-wide curfew was instituted, taking effect in the late afternoon.  The curfew orders applied to everyone living in the City. They were aimed at preventing all political protest at a time when hundreds of peaceful protestors sought to express their opposition to the police violence that resulted in the murder of George Floyd in Minneapolis, Breonna Taylor in Louisville and many other Black and Brown men and women.

3.  On May 31, 2020, and on June 1, 2020, the Santa Monica Police Department ("SMPD") arrested a total of approximately 400 people.  Although there was looting and vandalism that occurred in some parts of the City, the allegedly criminal activity was not in the area of the protests.  The SMPD, and officers from other law enforcement agencies responding to the City's request for mutual aid, focused on the protestors, rather than individuals engaged in looting and other criminal activity. As a result, few of those arrested were charged with a serious crime unrelated to the demonstrations. Nonetheless, the City of Santa Monica tried to prevent the peaceful protests by instituting curfew orders on short order to take effect at varying times in the afternoon of May 31 and June 1, 2020.

4. The police kettled the protestors at several locations.  As some of the protestors attempted to return to their cars and leave the area, they were met by random groups of officers, both from the SMPD and other agencies responding to the City's request for mutual aid, who roamed the streets, arresting anyone in a public place.  Some, like plaintiff CLENNON, were arrested while walking home alone, holding the sign they brought to the protest.  Others, such as plaintiff HOGAN, were shot with projectiles indiscriminately shot into groups of protestors when they presented no serious threat of harm to the police or anyone else, let alone <u>any</u> threat of harm, and were not violently resisting arrest.  Still others, like plaintiff BROWN, were targeted for arrest, plucked from a group of peaceful protestors, transported to the makeshift "jail," and released in the City of Los Angeles and warned they would be rearrested if they came back to Santa Monica.

5. SMPD ended the protests through the use of force (batons and "rubber bullets") and imposed unconstitutional conditions of confinement on arrestees by holding them on buses for many hours, tightly handcuffed with zip ties, without access to bathroom facilities, food, or water.  On the buses, arrestees were seated inches apart, with the windows closed and with no ventilation, compounding the potential exposure to COVID-19. When officers went to remove the zip ties, they lacked the necessary equipment to do so and so resulted to using knives and other sharp instruments to cut the restraints, injuring many arrestees in the process.

6. Most of the arrestees were transported to the Santa Monica Airport, where they were processed, cited and released.  As alleged herein, Defendants had no plan for mass arrests of peaceful protestors.  As a result, the arrests failed the most basic constitutional protections: there was no way to track which officer arrested which plaintiff, where and why.  Ultimately, all or almost all arrestees were released on a misdemeanor charge of violating a City Municipal Code provision that applied to

3

the curfew. SMPD's operation that day and mishandling of the response to the protests resulted in the immediate and abrupt retirement of Chief Renaud.

7. By preemptively banning peaceful assemblies, kettling the demonstrators, subjecting them to unlawful force, arresting and detaining them tightly handcuffed on buses for hours, without access to bathrooms, water, or food, Defendants violated Plaintiffs' federal and state constitutional rights.

## II.   JURISDICTION AND VENUE

8. This is an action for damages for violations of Plaintiffs' federal and state constitutional and statutory rights. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiffs' assert a claim under 42 U.S.C. § 1983.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. The Court has supplemental jurisdiction to consider Plaintiffs' state law claims under 28 U.S.C. § 1367 as these state law claims arise from the same common nucleus of operative facts as their federal claims.

9. Venue is proper in the Western Division of the Central District of California pursuant to 28 U.S.C. § 1931(b) because the events and conduct giving rise to Plaintiffs' claims all occurred in Los Angeles County.

## III.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiffs timely filed a claim for damages pursuant to California Government Code § 910, *et seq.* on behalf of the class of individuals injured by Defendants' wrongful conduct.  The claim was rejected by mail notice sent on December 28, 2020.  The state law claims herein are timely.

## IV.   PARTIES – PLAINTIFFS

11.      **BLACK LIVES MATTER LOS ANGELES** ("BLMLA") is part of a nationwide organization with chapters in many major cities, including the Los Angeles area. **BLMLA** originated in Los Angeles on July 13, 2013, the date

4

George Zimmerman was acquitted of killing teenager Trayvon Martin in Florida. **BLMLA** is one of the largest and most active chapters of BLM, with nearly 500 active members and organized ally groups, including White People for Black Lives. In response to George Floyd's murder, **BLMLA** sponsored protests in Los Angeles and Santa Monica and participated in protests organized by others. Defendants' actions interfered with **BLMLA**'s right to assembly and speech. **BLMLA** intends to assist, plan, participate in and hold similar events in the future, on its own or in conjunction with others, and fears that the same unlawful police actions in response to protests of institutional racism and police brutality will be repeated absent injunctive and declaratory relief to prohibit the practices, policies, and customs that caused the unlawful action in response to the recent protests.

12.     Plaintiff **DAVID BROWN** has lived in Santa Monica for more than 40 years, since high school. On May 31, 2020, he was protesting peacefully near the Third Street Promenade when he was grabbed by officers pulled out of the group of protestors and handcuffed.  Although he provided no resistance, he was struck with batons during the arrest process.  He was transported to the makeshift jail at the Santa Monica Airport, where he was held for hours without access to bathrooms, water or food, then cited for a curfew violation and released.  SMPD officers drove him to a gas station on Centinela Avenue, in Los Angeles and just across the border with Santa Monica.  The officers threatened that, if he returned to Santa Monica, he would be arrested. When Brown responded that he lived in Santa Monica, the officers repeated the threat.  Mr. **BROWN** wants to be able to engage in peaceful protest in the City in the future, without concern or fear that he will be arrested again, particularly by his mere presence in the City where he lives. Mr. **BROWN**'s arrest is shown below.

14.     Plaintiff **DAVID CLENNON** is a resident of the City of Santa
Monica.  On June 1, 2020, he participated in a protest in the City, near Ocean
Avenue.  When officers warned the assembled protestors to leave or face arrest,
he left the demonstration and started walking home. A short time after he walked
awy from the protests, he was contacted by officers in a patrol car.  **CLENNON**
continued walking on the public sidewalk, intermittently lifting his protest sign.
Although the curfew was in effect at the time, **CLENNON** observed a steady flow
of vehicles passing him on the street, none of which were stopped by the police.
**CLENNON** soon observed a second patrol car come on the scene.  A few moments
later, he was detained by Officer Ward, issued a citation for a curfew violation
even though he was on his way home, and released.

15.     Plaintiff **KERRY HOGAN** was attended a protest with her husband
on May 31, 2020 on Ocean Avenue near the Fisherman's Pier sign.   To show that

their peaceful intent, the protestors were on their knees with their hands in the air. At the time, **HOGAN** was not aware that the time of the curfew had been moved up by several hours and there was no police warning of the change in time.

16.      Around 4 pm, one person behind the protestors threw a single water bottle in the direction of the police. The response from law enforcement was immediate and unwarranted, firing LLMs indiscriminately into the group of protestors even though a single person threw a bottle, and even though the protestors, as a group, posed no threat of immediate violence.  No attempt was made to identify and remove the individual but, instead, an assault was launched on the entire group, without a dispersal order warning of the intention to use LLMs on the entire assembly, then on their knees with their hands up to communicate their non-violent, non-threatening protest.



17.     **HOGAN** got up to leave and was hit in her rib cage on right side of her body with a projectile, causing bruising and pain, as the officers continued to shoot into the group indiscriminately and without lawful justification. **HOGAN** estimates that the officers were well more than 100 feet away from the protestors at the time she was shot, far outside the allowable range for use of the target specific LLMs to ensure that individuals who do not pose an immediate threat of harm to the officer or others, or who are not violently resisting arrest are not struck with an instrument of force that can cause serious bodily injury, and even death. The officers shot indiscriminately into the protest despite the fact that many of the demonstrators were moving at the time and the deployment of target-specific weapons was improper in these circumstances.

18.     Some, such as **HOGAN**, were hit with projectiles in parts of the body that are prohibited strike zones for properly trained officers because of the well-documented potential for catastrophic injuries, and even death, from the force of less lethal munitions impacting vital organs



## V.     PARTIES – DEFENDANTS

17.     Defendant City of Santa Monica is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Santa Monica Police Department is an agency of Defendant City of Santa Monica, and all actions of the SMPD are the legal responsibility of the City of Santa Monica. At all relevant times, Defendant City was responsible for assuring that the actions, omissions, policies, practices, and customs of the SMPD and its employees and agents complied with the laws of the United States and the State of California.

18.     Defendant **CHIEF CYNTHIA RENAUD** was, at all times relevant to this action, the SMPD police chief and a policymaker for her department. She is sued in both her individual and official capacities.

19.     Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were agents, servants, or employees of Defendants City of Santa Monica and the SMPD.  Some Doe Defendants were part of a mutual aid response from local law enforcement agencies, and others were part of the National Guard, at all times responding to requests from Defendants for assistance and acting under the direction of the Defendant City of Santa Monica.  Plaintiffs are ignorant of the true names and capacities sued herein as Does 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in both their individual and official capacities.

20.     Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

21.     Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Defendants, and each of them, were the agents, servants, and employees of the other Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer. At all times, Defendants acted under the color of state law.

22.     Plaintiffs are informed, believe, and thereupon allege that Defendant City of Santa Monica's policies and failure of policies, including the failure to train its officers in constitutional responses to peaceful demonstrations, caused the unlawful action taken against Plaintiffs.

## VI.   STATEMENT OF FACTS

23.   On May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered George Floyd, suspected of forgery for attempting to use a purportedly counterfeit $20 bill. Officer Chauvin, along with two other officers, pinned Mr. Floyd on the ground, handcuffed behind his back, with their body weight on him and ignored pleas to get off his neck, back, and legs and to let him breathe. Bystanders videotaped the incident as Mr. Floyd died on the street in Minneapolis at the hands of the police. His murder ignited thousands of Americans to participate in protests across the country to proclaim Black Lives Matter.

24. Mr. Floyd joins the long list of Black and Brown victims whose lives were cut short, without lawful justification, by law enforcement officers.. In just a short time, Michael Brown, Breonna Taylor, Tamir Rice, Philando Castile, Freddie Gray, Walter Scott, Botham Jean, and Atatiana Jefferson were killed by police.

25. On May 31, 2020, the City imposed a curfew that went into effect at 4:00 p.m. That same day, hundreds of people joined protests in the City meant to decry the unjustified murder of George Floyd.  One protest took place on Ocean Avenue, where the Santa Monica Police Officers blocked the entrance to the Santa Monica Pier.  Despite the unlawful actions of a few at other locations, particularly those engaged in looting and vandalism, the vast majority of participants were peaceful protestors and were so identified by law enforcement in communications.

26. According to a review report prepared for the City by an outside group, the Office of Independent Review ("OIR"),[1]  the SMPD had no adequate plan, if they

---

[1] EXA-OIR Group Report (santamonica.gov) (INDEPENDENT AFTER ACTION AND EVALUATION REGARDING THE EVENTS LEADING TO, DURING, AND FOLLOWING MAY 31, 2020) issued May 4, 2021

had any, to interact with peaceful protestors while responding to individuals and groups engaged in unlawful conduct.  With looting going on in other areas of the City, the SMPD focused attention on the Plaintiffs and brought in mutual aid from neighboring jurisdictions, as well as the National Guard, to respond to peaceful protests.  Culver City, Redondo Beach and Beverly Hills responded to the request for mutual aid, albeit in a very limited fashion.  Without clear direction by SMPD, the addition of non-SMPD officers added to the chaotic law enforcement response.

27. No constitutionally valid policy on the use of less-lethal weapons would authorize deployment aimed at an individual's chest area, especially near the heart, because of the potentially serious, and possibly fatal, injury it could cause.  Any properly trained law enforcement officer, acting pursuant to a constitutionally sufficient policy, would know not to deploy a less-lethal launcher in this manner.

28. Acting on the alleged violation of the curfew, the SMPD, the National Guard, as well as members of other law enforcement agencies responding as mutual aid, handcuffed and arrested hundreds of peaceful protestors. All arrestees were detained for several hours, with most transported to the Santa Monica Airport.

29. Class member **DAVID BROWN** was detained under conditions generally applicable to the class as a whole.

30. The Airport location was inaccessible to public transportation.  Many of the arrestees were driven to locations in the City of Los Angeles, at the border with Santa Monica, and dropped off at gas stations.  Some, such as class representative **DAVID BROWN**, were told that they would be arrested if they returned to Santa Monica again during some undefined time period even though, as Plaintiff **BROWN** explained, he was a long-time resident of the Defendant City.

31.  Many class members had their wallets and cell phones confiscated at the time of their arrests and not returned at the time of release. For some plaintiffs, their phones were returned to them on release but were broken and inoperable.

## VII.  MONELL ALLEGATIONS

32.  According to the OIR report, the City of Santa Monica failed to conduct training on crowd control response to large protests for at least five year prior to the Floyd protests. While some officers had taken a course on advanced techniques, even that training was several years old.  The OIR identified this as a significant failure because SMPD's policies and training did not incorporate current practices. Current California Peace Officer Standards and Tactics ("POST") guidelines for crowd control management were not met.

33. The Defendant City failed to train, or failed to have adequate policies, on the lawful use of Less Lethal Munitions, especially in the context of responding to protests.  As a consequence of the City's failure, LLMs were deployed indiscriminately and improperly, causing physical harm and fear to demonstrators who posed no threat of immediate physical harm to officers or others, and who were not violently resisting arrest.

34. The Defendant City implemented a sweeping curfew that was not justified by the circumstances.  The initial curfew order was issued by a City manager and subsequently ratified by the City Council.   At the direction of the Chief of Police, a policy maker for the City, the protestors were kettled, handcuffed, arrested, held in unconstitutional conditions of confinement, charged with a curfew violation and then released because the SMPD failed to institute even the most basic criminal due process guaranteed to identify the arresting officer, the individualized suspicion to make an arrest, and other necessary factual predicates for a criminal prosecution.  At the time that the City determined to issue misdemeanor citations

to all of the arrestees, the City knew or should have not known that they could not proceed with these prosecutions because of the wholesale failure to document the most basic information for each arrest, creating criminal records for individuals who did no more than engage in peaceful protest.

35. The SMPD had no policy for mass bookings, for establishing a field jail, for transporting arrestees to jail, for completing necessary citations and booking – in short, no lawful strategy for arresting and detaining Plaintiffs in a manner consistent with constitutional requirements and calculated to avoid extensive delays before release.   Each of these policies would be expected to be included in a proper and current policy for crowd control management.   The OIR report concluded that the policies applied, and the overall lack of policies, produced a "debacle."

36. The lack of adequate policies resulted in the SMPD focusing on arresting peaceful protestors while others engaged in unlawful activity, including looters, were largely allowed to move to another area because the SMPD did not have the capacity to arrest them.

37. The use of force was ratified by the SMPD's failure to discipline more than a few officers, including the many officers the OIR found did not turn on their body cameras, despite evidence of multiple potential use-of-force incidents that raised clear concerns of unlawful and excessive force.   For example, the OIR reviewed body worn cameras and identified seven incidents that warranted investigation, at a minimum. This list included one officer who struck an individual seated on the ground with a baton to make the person move; pepperballs shot at a person running away from a parking garage; 37mm less lethal KIPS fired at proscribed body areas (as with Plaintiff **HOGAN**), or at persons running away; force used to take down

individuals wrongly suspected of being looters; and arrestees' hands cut while removing zip-ties with a knife.

## VIII. CLASS ACTION ALLEGATIONS

38.    One or more of the named Plaintiffs    bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to FRCP Rule 23(b)(1), (b)(2), and (b)(3). The damages classes are defined as:

a. **Arrest Class:** All persons present at the May 31, 2020 and June 1, 2020 protests regarding the killing of George Floyd in the City of Santa Monica, who were handcuffed and arrested by the SMPD and/or the City's agent, including but not limited to the National Guard, on charges of failure to obey a curfew, failure to disperse, unlawful assembly, or similar charges related to the protests, and who were subjected to prolonged detentions, tightly handcuffed and denied access to bathrooms and water.

b. **Direct Force Class:** All persons present at or during the aftermath of the George Floyd murder protests on May 31, 2020 and June 1, 2020 protests in the City of Santa Monica, who were subjected to unlawful force employed by Defendant City and its agents.

### B. Rule 23 Prerequisites

#### a. Numerosity

39.    In accordance with FRCP Rule 23(a)(1), the members of the class are so numerous that joinder of all members is impracticable. The Protest Class is composed of hundreds of people. The Arrest Class consists of more than 300 people, with the bulk of the arrests occurring late on May 31 and some effectuated on June 1, 2020.  The size of the potential Direct Force Class is presently unknown but is believed to be more than 300 people.  This estimate is based on the number

of Use of Force ("UOF") incidents reported by SMPD officers and documented in the investigation by the Office of Independent Review ("OIR").  The OIR found this number to be a significant undercount of the total UOF incidents.

### b. Commonality

40.   Questions of fact are common with respect to each class. These legal and factual questions include but are not limited to:

    a. Did Defendants impose curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protests in violation of the First Amendment?

    b. Did Defendants issue lawful dispersal orders prior to kettling and arresting the plaintiffs?

    c. Did the Defendants employ force to prevent and disperse the May 31, 2020 and June 1, 2020 George Floyd protests without regard to whether the such force was justified and without an adequate dispersal order?

    d. Did Defendants subject the arrest class to prolonged conditions of detention, handcuffed, without access to bathrooms and water?

41.   The common questions of law include, but are not limited to:

    e. The need to accommodate peaceable assembly and protest when imposing a sweeping curfew as a preemptive action based on unlawful actions of other individuals.

    f. The limits on use of force against peaceful protestors who pose no imminent threat of serious harm to law enforcement or other persons.

    g. The need to comply with lawful conditions of detention for arrestees, including access to bathrooms and, violate the Fourth or Fourteenth Amendments and their state law analogues.

16

h.  The requirement to refrain from intimidation, coercion and threats to violate Plaintiffs' constitutional and statutory rights as required by Cal. Civil Code § 52.1 (the Bane Act).

i.  The availability of class-wide damages available to the Plaintiffs.

j.  The statutory damages available under California Civil Code §52.1.

### c.  Typicality

42.     In accordance with FRCP 23(a)(3), the claims of the representative Plaintiffs are typical of the class. Plaintiffs were all present at the Santa Monica Floyd protests on May 31, 2020; were subjected to one or more of the violations previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future. Thus, Plaintiff have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to those suffered by each class member although the severity of the injuries may vary among class members.

43.     In accordance with F.R. Civ. P. Rule 23(a)(3), the representative Plaintiffs will fairly and adequately protect the interests of the class. Their interests are consistent with and not antagonistic to the interests of the class.

### d.  Adequacy of Representation

44.     The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

45.     The named Plaintiffs are represented by counsel who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Attorneys Carol Sobel and Paul Hoffman successfully litigated a number of class action cases on behalf of protesters in Santa Monica and are currently representing a class of approximately 4,000 persons arrested protesting the killing of George Floyd in *Black Lives Matter Santa Monica v. City of Santa Monica*, Case No. 20-cv-05027 CBM - AS (CD CA).

46.     Both Ms. Sobel and Mr. Hoffman served as class counsel in *Aichele, et al. v. City of Los Angelses, et al.*, Case No. 2:12-CV-10863- DMG (C.D. Cal. August 26, 2012), (LAPD denial of OR release to arrestees during the Occupy action at Los Angeles City Hall); *Chua v. City of Los Angeles*, Case No. CV 2:16-cv-00237-JAK-GJS(x) (C.D. Cal. January 12, 2016) (LAPD arrest of protestors of the police killing of Michael Brown in Ferguson, Mo.); *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, 24 F.R.D. 631 (C.D. Cal. 2007) (LAPD's assault on a lawful immigrant-rights rally in MacArthur Park on May 1, 2007). Attorney Erin Darling was counsel on two state court class actions: class counsel on *Guillory v. County of Los Angeles* (BC 581823) (General Relief recipients improperly cut off and denied benefits); counsel on *Reed v. State of California* (BC 432420) on behalf of middle school students at high-poverty schools staffed with junior-ranked teachers who were dismissed based on LAUSD seniority rules.

47.     Counsel for the named Plaintiffs knows of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

### e.  Maintenance and Superiority

48.     In accordance with FRCP Rule 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent

or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

49.     In accordance with FRCP Rule 23(b)(2), Defendants have acted on grounds generally applicable to the class as a whole.

50.     In accordance with FRCP Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and thereon allege, that the interests of the class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, *i.e.*, the City of Santa Monica. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than multiple courts.

51.     Plaintiffs do not know the identities of most class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the class members are ascertainable in significant part through SMPD arrest records, at least as it relates to those class members who were arrested. Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts through social media.

52.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

The class action is superior to any other available means to resolve the issues. Leading members of the Plaintiffs' counsel managed similar litigation with similarly disparate damages as a result of LAPD conduct in breaking up the May Day 2007 protests that resulted in the *MIWON* litigation described previously, as well as the *Aichele* and *Chua* litigation, all of which were against the City of Los Angeles and the LAPD. Liability can be determined on a class-wide basis. General damages can also be determined on a class-wide basis.

53.  In accordance with FRCP Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that SMPD computer records contain a last known address for class members who were arrested. Plaintiffs contemplate that individual notice be given to class members at such last known addresses by first class mail, email and cell phone outreach, social media, and efforts of organizations that organized the protests. Plaintiffs contemplate that the notice will inform class members of the following regarding their damages claims:

    a.  The pendency of the class action, and the issues common to the class;

    b.  The nature of the action;

    c.  Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in this class action;

    d.  Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

    e.  Their right, if they do not 'opt out,' to share in any recovery in favor of the class and, conversely, to be bound by any judgment on the common issues, adverse to the class.

54.     As a direct and proximate cause of the conduct described herein, the named individual Plaintiffs and the class members have been denied their constitutional, statutory, and legal rights as stated herein, and have suffered general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

55.     Defendants' acts were willful, wanton, malicious, oppressive, and done with conscious or reckless disregard, and deliberate indifference.

56.     All claims for relief are asserted against all Defendants.

57.     Although Plaintiffs' legal theories overlap in some instances, they apply differently to different classes. Accordingly, they state their claims by class.

## IX.          FIRST CLAIM FOR RELIEF – ARREST CLASS
### (First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983 for damages)

58.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

59.     The First Amendment generally requires the government to punish the few who break the law rather than proactively suppress lawful protest activity. "The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs … First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence." *Collins v. Jordan*, 110 F.3d 1363, 1371–72 (9th Cir. 1996). Under long-standing precedent, an unlawful assembly order may only be declared for "assemblies which are violent or which pose a clear and present danger of imminent violence," *In re Brown*, 9 Cal. 3d 612, 623 (Cal. 1973).

60.     In this instance, Defendants instituted sweeping curfew orders, criminalizing mere presence in the City during the hours of the curfew, even though the City had the ability to arrest looters and vandals but chose, instead, to shut down all assembly and expression. Plaintiffs were then arrested for violating the curfew. The extraordinary reach of Defendant Santa Monica's curfew violated Plaintiffs' "fundamental right of free movement, 'historically part of the amenities of life as we have known them.'" *Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (citations omitted). *Id.* at 946 (strict scrutiny of curfew order for minors).

61.     The City, through Chief Renaud and the SMPD, failed to enact necessary policies and to train officers in lawful responses to peaceful protests.

## X.     SECOND CLAIM FOR RELIEF – ARREST CLASS
**(Fourth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983 for damages)**

62.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

63.     All Arrest Class members were ultimately cited for violating the curfew order, because the SMPD had no means to identify the basis of individual arrests, the arresting officer and other basic information required to meet constitutional due process in a criminal proceeding.  Plaintiffs were placed on crowded buses and driven to a makeshift field jail at the Santa Monica Airport, where they were held for hours in tight handcuffs before being processed and released.  There were no bathroom facilities or water available at the Santa Monica Airport detention location and the officers did not have shears available to safely cut and remove the flex cuffs used to restrain the arrest class.  Instead, officers used knives and crude instruments to remove the cuffs, causing injury to some arrestees.

22

64.     Defendants lacked any adequate process to document arrests.  While some officers remained with arrestees as they waited for transport buses, others, including many mutual aid officers, used their patrol vehicles to drive arrestees to the airport, dropping off arrestees at the "jail."  For many arrestees, there was no documentation of why the person was arrested, where the arrest occurred, whether a dispersal order was given, or who the arresting officer was.  Nonetheless, without that essential information to meet due process in criminal proceedings, many members of the arrest class remained detained in unconstitutional conditions.

65.     The release of the arrest class was further delayed by the location of the makeshift jail, far from public transportation, and potential problems from releasing arrestees in the middle of the night.  Arrestees' detention was prolonged by the failure to have a way for them to leave the jail safely.

66.     Defendants' conduct violated the Arrest Class members' rights to be free from unreasonable seizures under the Fourth Amendment, the Fourteenth Amendment's due process clause and state constitutional analogues.

67.     As a result of Defendants' wrongful conduct, Arrest Class members suffered damages as alleged above.

## XI.     THIRD CLAIM FOR RELIEF - FORCE CLASS
### Fourth and Fourteenth Amendment to the U.S. Constitution;
### 42 U.S.C. § 1983

68.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

69.     All Direct Force Class members were shot with so-called "less-lethal weapons" and/or struck with batons.

23

70.     Members of the Direct Force Class were shot with "rubber bullets" and struck with batons in a manner that evinced that Defendants applied force unlawfully. Many were struck with "rubber bullets" in the upper body, including Plaintiff HOGAN. Less Lethal Munitions were deployed indiscriminately and inconsistent with policies and procedures to avoid target-specific weapons from striking those who presented no imminent threat of harm to an officer or others, or who are not violently resisting arrest.  Baton strikes were used not to compel people to retreat but to injure and punish them on site, as with Plaintiff BROWN.

71.     In violation of the Fourth amendment and analogous state provisions, Defendants used unreasonable and excessive force in indiscriminately deploying baton strikes and projectiles at protestors, not based on a determination of individual conduct justifying such force, but on the potentially unlawful acts of others.   This conduct was deliberately indifferent to the Direct Force Class members' rights, shocks the conscience, and violates the decencies of civilized conduct under the Fourteenth Amendment and its state law analogues.

72.     As a result of Defendants' wrongful conduct, and that of their employees and agents, Direct Force Class members suffered damages as alleged.

## XII.        FOURTH CLAIM FOR RELIEF
### Violation of the Bane Act (Cal. Civil Code § 52.1)

73.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set forth herein.  The federal and state constitutions guarantee the right to assembly and to petition the government for a redress of grievances, as well as to be free from unnecessary and excessive force by law enforcement officers. Defendants, by engaging in the wrongful acts and failures to act alleged above, denied these rights to the Plaintiffs by threats, intimidation, or

coercion, to deter, prevent and in retaliation for the exercise of Plaintiffs' First Amendment rights, in violation of Cal. Civ. Code § 52.1.

74.     The use of unreasonable force by Defendants was a substantial factor in causing the violation of rights and attendant harm by Plaintiffs.

75.     Defendant City of Santa Monica is liable for the wrongful conduct of its employees and its agents through the doctrine of respondeat superior and vicarious liability. Defendants' actions, as set out above, constituted interference by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California in violation of Cal. Civil Code §52.1. The violation of § 52.1 includes violations of the rights of the class members outlined throughout this Complaint.

76.     As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs sustained damages, including but not limited to general damages, statutory damages and treble statutory damages under Cal. Civ. Code § 52, but no less than $4,000 for each incident, and pain and suffering.

## XIII.          FIFTH CLAIM FOR RELIEF
### ASSAULT
### (By the Force Class Against Defendants)

77.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

78.     Defendants shot the members of the Excessive Force Class using Less-Lethal Launchers and struck them with batons.

79.     As a direct and proximate result of the aforementioned acts or omissions of Defendants, members of the Force Class sustained and incurred damages including physical injuries, and pain and suffering.

80.     The Defendant City of Santa Monica is liable for the actions of the officers of the Santa Monica Police Department through respondeat superior and vicarious liability, as well as for the agents of other government entities which responded to Defendant City's request for mutual aid and operated under the direction of employees and agents of the Defendant City.

XIV.             **SIXTH CLAIM FOR RELIEF**
          **BATTERY BY A POLICE OFFICER**
          **(The Force Class Against all Defendants)**

81.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

82.     Defendants, by the actions of the officers of the SMPD, its employees and agents, intentionally touched members of the Force Sub-Class without their consent by shoving, beating with batons, and shooting them with less-lethal projectiles, resulting in significant bodily injury to their person.

83.     As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs sustained and incurred damages including physical injury and pain and suffering.  The use of unreasonable force by the SMPD Officers and their agents was a substantial factor in causing harm to the Plaintiffs.

84.     The Defendant City is responsible for the actions of its employees and agents through the doctrine of respondeat superior.

XV.              **SEVENTH CLAIM FOR RELIEF**
          **FALSE ARREST/FALSE IMPRISONMENT**
          **(By the Arrest Class Against Defendants)**

85.     DEFENDANT CITY'S employees at the SMPD and its agents through mutual aid, while acting within the course and scope of their duties, intentionally deprived Plaintiffs in the Arrest Class of their freedom of movement

by detaining and subjecting them to custodial arrests without individualized reasonable suspicion or probable cause to believe a crime was committed.

86.    Ultimately, unable to ascertain which officers arrested which persons and for what offense, nearly all members of the Arrest Class were released on a charge of violating the curfew, regardless of the basis of their original arrest.

87.    Each member of the ARREST Class was imprisoned for hours on buses, without any ventilation or access to bathrooms, food and water.  The airport location where the arrestees were held and processed lacked any bathroom facilities All of the class members were handcuffed for hours and requests allow access to bathrooms and to loosen the restraints were ignored.

88.    The conduct of Defendants complained of herein was a substantial factor in causing the harm to Plaintiffs in the ARREST Class.

89.    Defendant City is liable for acts of its employees and agents pursuant to respondeat superior, vicarious liability and California Government Code §815.2(a).

## XVI.                    REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1.    An order certifying the class and each sub-class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (3);

2.    A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining Court jurisdiction to enforce the terms of the injunction;

3.    A declaratory judgment that Defendants' conduct alleged violated Plaintiffs' rights under the United States and California Constitution and laws;

4.    An order directing that all arrest records be removed from all criminal databases, whether operated by the City of Santa Monica, the State of California,

or any other governmental entity and that all arrests be reduced to a "detention" unless the individual arrested is convicted of the charge;

5.     For an order directing Defendants to identify to the Plaintiff class all entities and agencies to which such information has been disseminated;

6.     General and compensatory damages for Plaintiffs and the class they represent for the violations of their federal constitutional and statutory rights, pain and suffering, all to be determined according to proof;

7.     Statutory damages for Plaintiffs and the class(es) for the violations of their constitutional and statutory rights pursuant to California Civil Code §52;

8.     An award of attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5;

9.     Costs of suit;

10.    Pre- and post-judgment interest as permitted by law;

11.    Such other and further relief as the Court may deem just and proper.


Dated: June 28, 2021          Law Office of Carol A. Sobel
                              Law Office of Erin Darling
                              Schonbrun Seplow Harris Hoffman & Zeldes


                              ___/s/___Carol A. Sobel_____.
                              By: CAROL A. SOBEL
                              Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL


Plaintiffs hereby demand a jury trial in this action.

Dated: June 28, 2021


                              ___/s/___Carol A. Sobel_____.
                              By: CAROL A. SOBEL
                              Attorneys for Plaintiffs

28